**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ILLINOIS *Ex rel.* Michael Thornton | |
| Relator, | Civil Action No. 16-cv-07142 Judge John Robert Blakey Magistrate Judge Mary M. Rowland |
| v. | |
| PFIZER, INC., and HOSPIRA, INC. | |
| Defendants. | |

**RELATOR'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Introduction.......................................................................................………....1

Factual Background ................................................................................................. 1

Argument ................................................................................................................. 3

I.  Defendants Violated the FCA ..........................................................................3

    A.  Defendants' Fraudulent Activity Satisfies the Falsity Requirement.................4

        i.  Defendants fraudulently induced third-parties
           to submit false claims...................................................................5

        ii.  Defendants' misrepresentation of its role relating to
           Sapphire pumps to gain FDA approval satisfies an express
           false certification theory ..............................................................7

        iii.  Defendants' fraudulent conduct satisfies an implied false
           certification theory ......................................................................7

    B.  Defendants' Fraudulent Course of Conduct Demonstrates that
       Fraud is Likely with regard to False Claims Presented to the Government ...........8

    C.  Defendants had Full Knowledge of its Fraudulent Course of Conduct..................9

    D.  The FDA's Prior Import Ban and Defendants' Misleading Half-Truths
       Establish Materiality ......................................................................10

II.  Thornton's Abrupt Demotion Constitutes Retaliation in Violation of the FCA ...................12

    A.  Thornton's Repeated Complaints Constitute Protected Activity...........................13

    B.  Defendants Knew Thornton was Engaged in Protected Activity .........................14

III. Defendants Violated the IWA by Demoting Thornton. .........................................15

Conclusion ............................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................4

*Brandon v. Anesthesia & Pain Mgmt. Ass'ns, Ltd.*,
277 F.3d 936 (7th Cir. 2002)..........................................................................14, 15

*Emery v. Am. Gen. Fin., Inc.*,
134 F.3d 1321 (7th Cir. 1998)................................................................................4

*Fanslow v. Chicago Mfg. Ctr., Inc.*,
384 F.3d 469 (7th Cir. 2004)..................................................................12, 13, 14

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999)..................................................................................7

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
665 F.3d 930 (7th Cir. 2012)..................................................................................4

*Leveski v. ITT Educ. Servs., Inc.*,
719 F.3d 818 (7th Cir. 2013)..................................................................................4

*Midwest Commerce Banking Co. v. Elkhart City Ctr.*,
4 F.3d 521 (7th Cir. 1993)......................................................................................8

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
136 S. Ct. 1989 (2016) ..........................................................................3, 7, 8, 9, 10

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
764 F.3d 699 (7th Cir. 2014)..................................................................................8

*U.S. ex rel. Baltazar v. Warden*,
635 F.3d 866 (7th Cir. 2009)..................................................................................9

*U.S. ex rel. Brown v. Celgene Corp.*,
226 F.Supp.3d 1032 (C.D. Cal. 2016)..................................................................11

*U.S. ex rel. Brown v. Pfizer, Inc.*,
2017 WL 1344364 (E.D. Pa. Apr. 12, 2017) ........................................................5

*U.S. ex rel. Campie v. Gilead Sciences, Inc.*,
862 F.3d 890 (9th Cir. 2017).......................................................................... *passim*

*U.S. ex rel. Garst v. Lockheed-Martin Corp.*,
   328 F.3d 374 (7th Cir. 2003) ...................................................................................4

*U.S. ex rel. Geschrey v. Generations Healthcare, LLC*,
   922 F.Supp.2d 695 (N.D. Ill. 2012) ......................................................................4, 5

*U.S. ex rel. Halasa v. ITT Educ. Servs., Inc.*,
   690 F.3d 844 (7th Cir. 2012) .................................................................................13

*U.S. ex rel. Helfer v. Ass'n Anesthesiologists of Springfield, Ltd.*,
   2014 WL 4198199 (C.D. Ill. Aug. 25, 2014) .........................................................13

*U.S. ex rel. Hendow v. Univ. of Phx.*,
   461 F.3d 1166 (9th Cir. 2006) ..............................................................................5, 6

*U.S. ex rel. Higgins v. Boston Scientific Corp.*,
   2017 WL 3732099 (D. Minn. Aug. 29, 2017) ...........................................................6

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
   570 F.3d 849 (7th Cir. 2009) ...................................................................................4

*U.S. ex rel. Main v. Oakland City Univ.*,
   426 F.3d 914 (7th Cir. 2005) ...................................................................................5

*U.S. ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943) ................................................................................................5

*U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
   865 F.3d 29 (1st Cir. 2017) ..............................................................................5, 6, 9

*U.S. ex rel. Piacentile v. Snap Diagnostics, LLC*,
   2018 WL 2689270 (N.D. Ill. Jun. 5 2018) .........................................................10, 11

*U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
   892 F.3d 822 (6th Cir. 2018) ........................................................................10, 11, 12

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
   836 F.3d 770 (7th Cir. 2016) ................................................................................8, 9

*U.S. ex rel. Sheet Metal Workers Intl. Ass'n., Local 20 v. Horning Inv., LLC*,
   828 F.3d 587 (7th Cir. 2016) ...................................................................................8

*U.S. ex rel. Yesudian v. Howard Univ.*,
   153 F.3d 731 (D.C. Cir. 1998) ...............................................................................13

*U.S. ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*,
  244 F.Supp.3d 737 (N.D. Ill. 2017) ............................................................4, 9, 13

*Young v. Alden Gardens of Waterford, LLC*,
  30 N.E.3d 631 (Ill. App. Ct. 2015)..............................................................15, 16

**Statutes**

31 U.S.C. § 3729-3730 ............................................................................................3

31 U.S.C. § 3729(b)(1)(A) .......................................................................................9

31 U.S.C. § 3729(b) ...............................................................................................10

31 U.S.C. § 3730(h) .........................................................................................12, 13

740 Ill. Comp. Stat. 174/20...................................................................................15

740 Ill. Comp. Stat. 175 ..........................................................................................3

**Other Authorities**

21 C.F.R. § 820.3(o) ................................................................................................5

Fed. R. Civ. P. 9(b) ................................................................................................10

Defendants Pfizer, Inc. ("Pfizer") and Hospira, Inc. ("Hospira") (collectively, "Defendants") fail to acknowledge the fraudulent activity at the core of Relator Michael Thornton's ("Thornton") allegations in his Amended Complaint. Contrary to Defendants' assertion, the allegations, when taken in the light most favorable to Thornton, as they must at this stage, show Defendants fraudulent conduct in selling defective Sapphire infusion pumps and effectuating multiple silent recalls when the device proved to be dangerous and worthless. Defendants' fraudulent activity violated the False Claims Act ("FCA") because it caused the government to unknowingly pay for the defective pumps. Moreover, Defendants violated the FCA and the Illinois Whistleblower Act ("IWA") by promptly demoting Thornton in retaliation for refusing to prepare and submit illegal documentation, complaining about the myriad safety issues related to the devices, and attempting to stop fraud on the government when no action had been taken. As such, Defendants' Motion to Dismiss ("Motion") should be denied in its entirety.

## FACTUAL BACKGROUND

In August 2012, the U.S. Food & Drug Administration ("FDA") issued a warning letter to Hospira because of myriad quality problems related to infusion pumps made at Hospira's manufacturing plant in Costa Rica. (Am. Compl. ¶ 18.) On November 8, 2012, due to a voluntary hold and recall of Hospira pumps, the FDA imposed an import ban on Hospira, which prevented Hospira from importing and selling infusion pumps manufactured at Hospira's Costa Rica facility. Id. at ¶ 19. While still under the FDA's import ban, Hospira entered a partnership with Q Core so it could remain in the U.S. market for infusion pumps. From the outset Hospira was intimately involved in all aspects of the development and marketing of the Sapphire pumps, and quickly became involved in the manufacturing of the pumps as well. Id. at ¶¶ 21-23. However, to avoid further regulatory scrutiny, Hospira characterized to the FDA that its role in

selling the Sapphire pumps was merely that of a distributor. Id. at ¶¶ 20-22, 44. Contrary to what the FDA was led to believe, Hospira actively created marketing materials with false information about the Sapphire pumps' accuracy to message around known product defects and directed its sales staff to mischaracterize the device's functionality. Id. at ¶¶ 25-26. Hospira executives also repeatedly described Hospira's role with the Sapphire pumps as a partnership and co-developer, and not merely a distributor. Id. at ¶¶ 23-24.

In June 2013, Thornton began working for Hospira, and was promoted to Senior Manager Sapphire Quality Systems in December 2014. Id. at ¶¶ 14, 31. Beginning in February 2015, Thornton discovered several problems with three components of the Sapphire pumps: (1) defective power cords prevented patients from receiving medication, and delivered electrical shocks to patients and medical staff handling the device; (2) faulty software constantly disabled the pumps with false alarms, preventing patients from receiving the proper dosage of medication; and (3) microbore tubing leaked medication. Id. at ¶¶ 33, 35-36, 54-55, 66. Despite federal regulations requiring companies to inform the public of any recalls of defective medical devices, as well as FDA reporting requirements for any product recall decisions related to safety decisions, Hospira failed to inform the public or report anything to the FDA or other regulatory bodies. Id. at ¶¶ 41-49, 56-76. Instead, Hospira intentionally concealed the myriad device defects, and mischaracterized Hospira's remedial steps (which, nonetheless, failed to fix the Sapphire pumps) to avoid FDA regulatory scrutiny. Id. Despite the wholly defective nature of the Sapphire pumps, Defendants sold the devices to medical providers, who in turn submitted requests to, and received payment from, the government. Id. at ¶¶ 10, 12.

Thornton continuously tried to stop Hospira's fraud on the government and refused to participate in the unlawful actions.  On multiple occasions between February and August 2015,

2

Thornton complained to members of senior management, including Chris Ganser, Amy Giertych, Joe Sener, and Chad Jansen, about Hospira's failure to inform the public or fulfill its FDA reporting requirements. Id. at ¶¶ 77, 80, 83-85, 88. He also refused to prepare documentation that allowed defective microbore sets to be returned to Q Core without publicly announcing a recall of the defective products. Id. at ¶ 71. On June 18, 2015, mere days after Thornton suggested escalating his ignored concerns to David Endicott, President of Hospira Medical Devices, and Michael Ball, Hospira's Chief Executive Officer, Hospira demoted Thornton and ostracized him from his work colleagues. Id. at ¶¶ 88-94. He was explicitly told at the time of his demotion that he no longer had to lose sleep over Q Core (*i.e.*, the defective Sapphire pumps). Id. at ¶ 91.

## ARGUMENT

### I.      Defendants Violated the FCA.

Thornton need only allege that it was *plausible* that Defendants defrauded the government through the submission of one or more reimbursement claims. To proceed under the FCA, 31 U.S.C. §§ 3729-3730 and the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.* ("IFCA"), Thornton must allege: (1) a false or fraudulent claim; (2) was caused to be presented to the Government for payment or approval; (3) with knowledge that the claim was false; and (4) the falsehood was material to the Government's payment decision. 31 U.S.C. § 3729; 740 Ill. Comp. Stat. 175/3(a)(1); Universal Health Servs., Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 1996 (2016). Here, Thornton pled sufficient facts regarding Defendants' fraudulent scheme to violate the FCA and IFCA.[1]

---

[1] Thornton's allegations are strikingly similar to a recent settlement announced by the Department of Justice where a quality control analyst at a medical device manufacturer alleged that the company knowingly sold materially unreliable devices and failed to take appropriate corrective action after numerous customer complaints about the defective devices. See https://www.justice.gov/opa/pr/alere-pay-us-332-million-settle-false-claims-act-allegations-relating-unreliable-diagnostic.

**A.      Defendants' Fraudulent Activity Satisfies the Falsity Requirement.**

At the pleadings stage, a relator's claim "need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). A relator must plead the circumstances constituting fraud, including the who, what, when, where and how of the alleged fraud. U.S. ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 376 (7th Cir. 2003). A relator does not need to have actually witnessed the defendants' specific request for payment or have had direct access to fraudulent paperwork submitted to the government. U.S. ex rel. Geschrey v. Generations Healthcare, LLC, 922 F.Supp.2d 695, 705 (N.D. Ill. 2012). See U.S. ex rel. Zverev v. USA Vein Clinics of Chicago, LLC, 244 F.Supp.3d 737, 746 (N.D. Ill. 2017) (finding that no requirement exists for relators to allege details about specific bills submitted to the government for reimbursement); Leveski v. ITT Educ. Servs., Inc., 719 F.3d 818, 839 (7th Cir. 2013) (inferring that a certification must have been submitted to the government despite no specific certification identified in complaint because defendant could not have otherwise obtained funding from government); U.S. ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009) (finding that producing actual documentation is not necessary for a relator, whereas plausible inferences are sufficient at the pleading stage); Emery v. Am. Gen. Fin., Inc., 134 F.3d 1321, 1323 (7th Cir. 1998) (finding that plaintiffs are not required to allege facts to satisfy 9(b) standard that could not be acquired without discovery). The Seventh Circuit stresses "the importance of balancing detail with flexibility in applying the Rule 9(b) standard," and criticizes courts and litigants that cling too tightly to a recital of the who, what, when, where and how, as opposed to understanding that

4

each relator's access to information differs. Geschrey, 922 F.Supp.2d at 705 (1st Cir. 2017). See also U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d 29, 37 (1st Cir. 2017) (finding liability for selling defective devices as indirectly causing false submission of claims).

Defendants' fraudulent activity goes to the heart of its approval from the FDA and the payments made by the Government for the Sapphire pumps. Defendants misled the Government about the relationship between Hospira and Q Core[2] to obtain FDA approval, then concealed and mischaracterized the medical devices' defective and unreliable nature to evade further FDA scrutiny. Defendants never complied with FDA reporting requirements related to its defective devices, and simultaneously caused the submission of false claims to the Government.

      **i.**      **Defendants fraudulently induced third-parties to submit false claims.**

A defendant may be liable under the FCA if its fraudulent conduct causes a third-party to wrongly seek and receive payment from the government. See e.g., U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 543-544 (1943) (finding company's initial fraudulent action – misrepresentation by omission of relevant facts – and every subsequent step led to government payments of false claims); U.S. ex rel. Main v. Oakland City Univ., 426 F.3d 914, 916 (7th Cir. 2005) (finding FCA violation where university certified compliance with regulations to secure federal financial aid, despite intentional noncompliance); U.S. ex rel. Campie v. Gilead Sciences, Inc., 862 F.3d 890, 902 (9th Cir. 2017); Nargol, 865 F.3d at 37-41; U.S. ex rel. Hendow v. Univ. of Phx., 461 F.3d 1166, 1173 (9th Cir. 2006); U.S. ex rel. Brown v. Pfizer, Inc., 2017 WL 1344365, at *9 (E.D. Pa. Apr. 12, 2017) (finding FCA liability for fraudulent inducement where Pfizer made false representations to obtain FDA approval and initially induced government to enter ongoing

---

[2] The FDA defines a "manufacturer" as "any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, re-labeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions." 21 C.F.R. § 820.3(o).

5

payment relationship). Under a fraudulent inducement theory, all "subsequent claims to the government [for payment] are false because of an original fraud (whether a certification or otherwise)." Hendow, 461 F.3d at 1173.

Specifically, a fraudulent inducement theory may apply when a defendant causes a third-party to submit false claims by selling products that are defective and do not comply with FDA regulations. See e.g., Nargol, 865 F.3d at 37-41; U.S. ex rel. Higgins v. Boston Scientific Corp., 2017 WL 3732099, at *9 (D. Minn. Aug. 29, 2017) (recognizing the potential viability of a fraudulent inducement theory based upon the sale of a defective medical device). For example, in Nargol, 865 F.3d at 37-41, the defendant knowingly sold defective hip-replacement devices to healthcare providers, who in turn submitted claims for payment to the government. In denying defendant's motion to dismiss, the court held that defendant's fraudulent acts of knowingly palming off the defective devices may constitute actionable misconduct under the FCA because it caused the providers to submit false claims, either through express or implied certifications.

Defendants do not address a fraudulent inducement theory in their Motion, and therefore have waived any arguments that Thornton failed to properly allege fraudulent inducement. Notwithstanding, Thornton has properly alleged facts to support a fraudulent inducement theory. Namely, Defendants engaged in an ongoing scheme of fraud related to the Sapphire pumps. For one, they failed to properly disclose to the FDA their role in the development and manufacturing of the pumps. Moreover, after the FDA approved the sale of Sapphire pumps, Defendants continued to sell the pumps, even though they were defective and dangerous. Defendants refused to notify the FDA and the public about the pumps' non-conformities, and instead instituted multiple silent recalls. In short, like the defendant in Nargol, Defendants valued profits over

public safety and FDA compliance. By doing so, they induced healthcare providers to seek payment from unwitting government payors, and thereby violated the FCA.

> ii. **Defendants' misrepresentation of its role relating to Sapphire pumps to gain FDA approval satisfies an express false certification theory.**

Liability for false certification is found when compliance with regulations was a prerequisite to gaining a benefit, and defendants affirmatively certified such compliance. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 787 (4th Cir. 1999). When the government conditions payment of a claim upon a claimant's certification of compliance with regulations, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that regulation. Id.

Defendants' compliance with statutory and regulatory requirements was a prerequisite to the FDA approving the sale of Sapphire pumps in the U.S. Defendants misled and misrepresented their role as device developer/importer from the outset to obtain FDA approval, which allowed them to remain in the infusion pump market and avoid any financial impact from the FDA's import ban. Furthermore, Hospira's marketing materials to the Government and public made false and mischaracterizing statements about the Sapphire pumps' accuracy and functionality. Such misrepresentation may give rise to a false claim. See Campie, 862 F.3d at 900 (holding falsity sufficiently pled under factually false certification theory where defendant made false statements to the FDA).

> iii. **Defendants' fraudulent conduct satisfies an implied false certification theory.**

Two conditions must be satisfied for an implied false certification claim: (1) "the claim does not merely request payment, *but also makes specific representations about the goods or services provided*"; and (2) defendants "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-

7

truths." Escobar, 136 S. Ct. at 2001 (emphasis supplied). Half-truths that are "representations that state the truth only so far as it goes, while omitting critical qualifying information" are actionable misrepresentations. Id. at 2000. Liability is created by affirmative false statements and omissions that render representations to the government misleading. U.S. ex rel. Sheet Metal Workers Intl. Ass'n Local 20 v. Horning Inv., LLC, 828 F.3d 587, 592-593 (7th Cir. 2016). "Omissions are actionable as implied representations when the circumstances are such that a failure to communicate a fact induces a belief in its opposite." Midwest Commerce Banking Co. v. Elkhart City Ctr., 4 F.3d 521, 524 (7th Cir. 1993). Furthermore, worthless services are probative under a false certification theory that a false claim for reimbursement was made. U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc., 764 F.3d 699, 710 (7th Cir. 2014). Defendants' heavy reliance on non-binding precedent is unpersuasive and distinguishable from Thornton's circumstances since the cases do not allege an overall fraudulent course of conduct carried out by defendants.

Thornton describes in significant detail the fraudulent conduct initiated by Hospira in mischaracterizing its role as the co-developer, manufacturer and marketer of the Sapphire pumps, which allowed it to avoid the FDA's import ban. (Am. Compl. ¶¶ 18-24.) Defendants concealed the myriad device defects that rendered the Sapphire pumps worthless to patients and customers. (Am. Compl. ¶¶ 25-26, 33-76.) Furthermore, by mischaracterizing the silent recalls and hold requests related to the defective components, Defendants avoided further regulatory scrutiny by the FDA. These are omissions of relevant consequence.

### B. Defendants' Fraudulent Course of Conduct Demonstrates that Fraud is Likely with regard to False Claims presented to the Government.

As the Seventh Circuit makes clear, "a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government."

U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC, 836 F.3d 770, 777 (7th Cir. 2016).
Moreover, "[a] relator need not have seen the claims submitted to the federal government . . . but
must know enough to make fraud a likely explanation." U.S. ex rel. Baltazar v. Warden, 635
F.3d 866, 870 (7th Cir. 2009). The Seventh Circuit has repeatedly held that Rule 9(b)'s
particularity requirement must be relaxed where a plaintiff lacks access to all necessary facts that
lend detail to his claim. Zverev, 244 F.Supp.3d at 746. Likewise, the particularity requirement
should be relaxed where the complaint alleges facts showing that defendant's conduct caused a
third-party to submit false claims. Nargol, 865 F.3d at 39-41.

Thornton described Defendants' fraudulent conduct to circumvent FDA scrutiny in
obtaining initial FDA approval, and in order to continue selling the defective pumps. For
example, he alleged that the Sapphire pumps required more than fifty-five (55) software
revisions during the first four years of the product's launch. The software revisions applied to
each Sapphire pump sold. Additionally, Thornton provided details about the number of Sapphire
pumps Defendants expected to sell within the U.S. in 2015, and also explained that Defendants
received thousands of complaints regarding the defective and dangerous pumps between 2015
and 2016. Given these allegations, any FDA compliance certifications and reimbursement claims
submitted to the Government related to the infusion pumps were premised on Defendants'
fraudulent conduct. Thus, Thornton has alleged sufficient detail at this stage.

### C.    Defendants had Full Knowledge of its Fraudulent Course of Conduct.

The scienter element under the FCA "defines 'knowing' and 'knowingly' to mean that a
person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or
falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the
information.'" Escobar, 136 S. Ct. at 1996 (quoting 31 U.S.C. § 3729(b)(1)(A)). However, unlike

the heightened pleading standard of the other FCA claim elements, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Thornton sufficiently alleged scienter. Defendants knew they were under an FDA import ban at the time they sought FDA approval to sell Sapphire pumps. Defendants misled the Government about the full nature of their role in developing, marketing, and selling the pumps. Moreover, after receiving initial approval from the FDA, Defendants knew that the devices were defective and non-compliant, based on Thornton's repeated complaints, quality-assurance department reports, and the thousands of customer complaints. Nonetheless, Defendants knowingly continued to sell the defective pumps and represent that they met all FDA requirements (even though they did not), thereby causing fraudulent claims to be submitted.

**D.     The FDA's Prior Import Ban and Defendants' Misleading Half-Truths Establish Materiality.**

"Under the False Claims Act, a falsehood is material if it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Campie, 862 F.3d at 905 (quoting 31 U.S.C. § 3729(b)). According to the Supreme Court, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation. Escobar, 136 S. Ct. at 2002. In analyzing materiality, no single consideration is dispositive, but rather the court must look at the totality of the circumstances. U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc., 892 F.3d 822, 831 (6th Cir. 2018).

Defendants made misrepresentations about the infusion pumps, including misleading half-truths about Hospira's role as manufacturer and non-compliance with FDA requirements. Such misrepresentations were conditions of participation for Defendants to sell the Sapphire pumps and are inextricably tied to eligibility to receive payment from the Government for the non-compliant and defective devices. See U.S. ex rel. Piacentile v. Snap Diagnostics, LLC, 2018

WL 2689270 at *4 (N.D. Ill. Jun. 5, 2018) (finding materiality satisfied where company misled government into paying claims by failing to disclose noncompliance with regulations); U.S. ex rel. Brown v. Celgene Corp., 226 F.Supp.3d 1032, 1049 (C.D. Cal. 2016) ("Escobar does not foreclose the possibility that a [regulatory] requirement may be so central to the functioning of a government program that noncompliance is material as a matter of law."). Moreover, the FDA previously banned Hospira from importing infusion pumps due to, among other things, alarm failures and software issues. Given the prior import ban, the Court may properly infer that FDA compliance and properly functioning devices are material and go to the essence of Defendants' bargain with the Government. Given the FDA's history of prohibiting the sale of similarly defective infusion pumps, the Government would not have paid for the defective Sapphire pumps had it known about their deficiencies.

Nonetheless, Defendants argue that the Government's payment of submitted claims forecloses Thornton's allegations of materiality. Defendants' argument is wrong. See Piacentile, 2018 WL 2689270 at *4 (rejecting company's argument that routine payments of claims are strong evidence that regulatory requirements were not material). For one, Thornton disputes that the Government knew about Defendants' noncompliance, and alleges in great detail Defendants' fraudulent scheme to conceal the Sapphire pumps' dangers and deficiencies from the Government. Assuming these allegations are true, which the Court must do at this stage, any potential payments made by the Government (payments made absent knowledge of the fraud) have no relevance for purposes of determining materiality. See Prather, 892 F.3d at 836.

The above notwithstanding, contrary to Defendants' assertion, a relator is not required to make allegations about past government action. Prather, 892 F.3d at 834 (finding that the government's response to claims submitted by defendants has no bearing on materiality

11

analysis). See Campie, 862 F.3d at 906 (finding continued FDA approval and its effect on government's payment decisions unpersuasive to materiality analysis since fraudulently-obtained FDA approval cannot be used as a shield against liability for fraud and FDA may have other reasons for its regulatory decisions). Similarly, whether the government decides to intervene has no bearing on the materiality analysis. Prather, 892 F.3d at 836.

In short, the issues raised by Defendants regarding materiality are matters of proof, and not legal grounds to dismiss. See Campie, 862 F.3d at 907. At this stage, Thornton has no obligation to identify any regulatory action by FDA, notwithstanding the fact that he is in no position to know what, if any, action(s) the FDA takes. Nevertheless, the Court should take judicial notice that ICU Medical, the company that purchased the Infusion Pumps division from Defendants, included in its recent filing with the Securities and Exchange Commission ("SEC") the fact that the Department of Justice issued a criminal subpoena to Hospira in April 2018 requesting documents related to the manufacturing, production, testing, quality and validation of the Sapphire pumps, sets and related accessories, and that it was coordinating with Defendants to produce the requested documents. See ICU Medical, Inc., Quarterly Report (Form 10-Q, p. 41) (Aug. 9, 2018), available at, https://ir.icumed.com/static-files/5eece596-bae4-40b0-99b0-427b38927de3. Defendants' argument that Thornton's failure to identify any FDA action makes an improper adverse inference regarding materiality, which the SEC filing proves to be untrue.

## II.     Thornton's Abrupt Demotion Constitutes Retaliation in Violation of the FCA.

Defendants' demotion of Thornton in close proximity to his protected activity violated 31 U.S.C. § 3730(h). To proceed with an FCA retaliation claim, a relator must allege: (1) his actions were "in furtherance of . . . including investigation for" an FCA enforcement action; (2) Defendants knew relator was engaged in protected activity; and (3) Defendants demoted,

discharged, harassed, or discriminated against relator, and were motivated, at least in part, by relator's protected activity. Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 479 (7th Cir. 2004). The particularity requirements of Rule 9(b) do not apply to retaliation claims. Zverev, 244 F.Supp.3d at 749.

Defendants do not contend that Thornton failed to satisfy the third element. Thus, Defendants concede that Thornton's demotion was motivated by his protected activity.

### A.     Thornton's Repeated Complaints Constitute Protected Activity.

An employee engages in protected activity under § 3730(h) when: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." Fanslow, 384 F.3d at 480. Courts interpret the term "protected activity" broadly, consistent with the purpose of the statute. Id. at 479. Investigating matters which reasonably could lead to a viable FCA action constitutes protected activity. Campie, 862 F.3d at 907. See U.S. ex rel. Helfer v. Ass'n. Anesthesiologists of Springfield, Ltd., 2014 WL 4198199, *7 (C.D. Ill. Aug. 25, 2014) (describing the broadened protections of "protected activity" in the 2009 amendments to the FCA). Furthermore, a relator need not have actual knowledge of the FCA for his actions to be considered "protected activity." Id. Moreover, courts consistently recognize that internal complaints to supervisors about suspected misconduct is FCA-protected conduct. See Halasa v. ITT Educ. Servs., Inc., 690 F.3d 844, 846-49 (7th Cir. 2012); Fanslow, 384 F.3d at 481; U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 741-42 (D.C. Cir. 1998).

Thornton had an objectively reasonable and good faith belief that Defendants were committing fraud against the Government. He repeatedly complained to senior management about the defective devices and Defendants' non-compliance with FDA reporting regulations.

He also raised questions about Defendants' fraudulent conduct with regard to billing for devices that did not work and orchestrating multiple illegal silent recalls. Thornton believed Defendants were wrong for not reporting myriad issues to the FDA, and communicated such to management.

### B. Defendants Knew Thornton was Engaged in Protected Activity.

Thornton must demonstrate that his protected activity put Defendants on notice of the possibility of an FCA action. Fanslow 384 F.3d at 483. A relator who is not a fraud-alert employee is not required to use any "magic words" of "illegal" and unlawful" to place his employer on notice. Id. at 484-85 (finding notice requirement satisfied by employee's repeated internal complaints and refusal to sign off on business purchases that risked future funding). Allegations of notice are not a high bar at the pleading stage. Campie, 862 F.3d at 908.

Here, Thornton made repeated complaints to his direct supervisors and other members of senior management (both inside and outside his direct chain of supervision) about safety concerns with the defective devices and Defendants' non-compliance with FDA reporting regulations. (Am. Compl. ¶¶ 77, 80-85, 88, 91.) His concerns were rebuffed, and when Thornton threatened to escalate his concerns to the CEO and/or President, he was reprimanded and promptly demoted. (Am. Compl. ¶¶ 89, 90.) Upon his demotion, Thornton's manager told him he no longer had to lose sleep over the defective devices. (Am. Compl. ¶ 91.) Thornton also refused to prepare or sign off on documentation that perpetuated Defendants' fraudulent conduct and orchestrated any illegal silent recall. (Am. Compl. ¶¶ 71-73, 80.) Thornton's actions made Defendants amply aware that he was complaining about Defendants' fraudulent actions.

Defendants erroneously rely on Brandon v. Anesthesia & Pain Mgmt. Ass'ns., Ltd., 277 F.3d 936 (7th Cir. 2002). There, the court used a heightened standard for Brandon because his job duties specifically involved investigating billing reports to ensure billing practices complied

14

with federal regulations. However, Thornton's job duties were limited to quality assurance of the Sapphire pumps, thus the heightened <u>Brandon</u> standard is inapplicable. Yet, even under the heightened standard, Thornton satisfied the requirement. <u>See</u> <u>Campie</u>, 862 F.3d at 907-09. He explicitly discussed the illegality of Defendants' conduct, repeatedly referenced violations of FDA regulations and questioned why Defendants were selling defective pumps. (<u>See</u> Am. Compl. ¶¶ 80, 83, 85, 88, 89, 91.) As such, the Court should deny Defendants' Motion.

## III.    Defendants Violated the IWA by Demoting Thornton.

"An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. To succeed, an employee must show he refused to participate in unlawful activity, and that his employer retaliated against him for doing so. <u>Young v. Alden Gardens of Waterford, LLC</u>, 30 N.E.3d 631, 643 (Ill. App. Ct. 2015).

In addition to his multiple complaints regarding Defendants' violations of FDA regulations and general refusal to fall in line with Defendants' unlawful conduct, Thornton also specifically refused his supervisor's instruction to prepare documentation allowing defective microbore sets to be returned to Q Core without Defendants publicly announcing a recall. (Am. Compl. ¶¶ 71-73.) In addition to refusing to prepare such documents, Thornton also refused to sign any forms authorizing the return of the defective microbore sets. <u>Id.</u> Thornton reasonably believed that both instructions constituted an illegal silent recall. Shortly after refusing his supervisor's directives, Defendants demoted Thornton.

Defendants' claim that the Amended Complaint did not specify the law, rule or regulation that Thornton would have violated is specious. The allegations are replete with references to Defendants' violation of FDA regulations. Courts have allowed similar alleged pleading defects

15

to move forward, especially where discovery can easily establish that the refused activity would be unlawful. <u>See</u> <u>Young</u>, 30 N.E.3d at 643-645 (finding defendant's contention that plaintiff failed in her proof because she did not identify the violated law to be frivolous where plaintiff pled refusing to falsify records and retaliation for refusing to engage in improper practices). As such, the Court should deny Defendants' Motion with regard to Count IV.

## CONCLUSION

WHEREFORE, Thornton respectfully requests that this Court deny Defendants' Motion to Dismiss Relator's First Amended Complaint in its entirety and grant Thornton any other relief that this Court deems appropriate in the interests of justice. Alternatively, in the event the Court is inclined to grant Defendants' Motion, Thornton respectfully requests leave to file a Second Amended Complaint to remedy any deficiencies identified by the Court.

Dated: August 17, 2018                  Respectfully submitted,

Marc J. Siegel, #6238100           MICHAEL THORNTON
Bradley Manewith, #6280535
James D. Rogers, #6324570
Siegel & Dolan Ltd.
150 North Wacker Drive, Suite 1100   By:/s/ Bradley Manewith
Chicago, IL 60606                   Attorney for Relator
Tel. (312) 878-3210
Fax (312) 878-3211
msiegel@msiegellaw.com
bmanewith@msiegellaw.com
jrogers@msiegellaw.com

16

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing, **Relator's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Relator's First Amended Complaint**, was filed electronically on August 17, 2018 using the CM/ECF system, which will automatically send electronic mail notifications to all attorneys presently of record, including the following individuals, and which will permit viewing and downloading of the same from the ECF system.

Ilana H. Eisenstein (*pro hac vice*)
DLA Piper LLP (US)
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania
Telephone: 215.656.3351
Facsimile: 215.606.3351

John Hamill
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois
Telephone: 312.368.7036
Facsimile: 312.251.5809

Andrew J. Hoffman II (*pro hac vice*)
DLA Piper LLP (US)
2000 Avenue of the Stars
North Tower, Suite 400
Los Angeles, California
Telephone: 310.595.3010
Facsimile: 310.595.3310

By: /s/ Bradley Manewith
    Attorney for Relator